case number 242889. Good morning, your honors, may it please the court. My name is Sam Magrum. I represent Appellant Juan Tacuri in this appeal, but did not represent him below. This court should vacate Mr. Tacuri's sentence and reassign it for resentencing before a different district court judge. This is necessary because the district court below procedurally erred by broadcasting Mr. Tacuri's sentence, permitting victims to address the court via that broadcast and relying on those improperly received statements in imposing sentence. That sentence, which at 240 months is nearly double the high end of the applicable guidelines range, was substantively unreasonable as well because it was inadequately justified and because it creates enormous sentencing disparities. Can you point to anything in the statements that were made remotely that significantly impacted what the sentence was? I mean, the judge had a lot of victim input, whether in writing, in the courtroom. So what what else was so egregious, for lack of a better word, in the remote testimony that that alone is what caused this maximum sentence? Yes, your honor. There were several things shared by victims via the broadcast that were not included otherwise via their written submission or by a victim who spoke in the courtroom. Particularly, for example, victim E.C. spoke about being pressured to sell her home so that she could invest the proceeds. Another victim, victim M.L.M., mentioned a victim who had cancer and because he had lost money in the four-count scheme, he was unable to afford treatment. And the district court then relied upon those and other anecdotes from the victims to direct the court's attention to appendix 274 and 275 where the court did that. I think also that the general tenor of the remotely received victim impact statements were notably different from those that were, from those victims who spoke in court. They spoke, generally speaking, at more length and I think directed more vitriol toward Mr. Takuri. And perhaps that's a result of the fact that they were speaking via a broadcast. They weren't within the four walls of the courtroom. They weren't subject to the solemnizing effect that being in court might have. Certainly recognize that it can be difficult to identify, in particular, the effects that the broadcast had. I cited a few examples for your honor. But more generally, as the Supreme Court has warned in Essex v. Texas a half-century ago, it's hard sometimes to identify the nature of prejudice that results from broadcasting in any particular case. And that's why Rule 53 was promulgated in a legislative-type fashion. That's why Rule 53 does not allow district court's discretion to disregard it and to broadcast sentencing. And that's why district courts from this circuit, from within this circuit and around the country that have considered Rule 53 have held uniformly that Rule 53 does not permit victims to address the broadcasting of proceedings, even where doing so would facilitate victim participation. Would it matter if, because the word broadcast to me sounds like outgoing, would it matter if victim or complainant testimony were received remotely, but no one in the public was, no one but the victim speaking was on that connection? Would that still be broadcasting? What I'm trying to do is think about the government's argument about the victim's rights and sets aside the right to be present as opposed to the right to speak. But could a victim be given the ability to speak at a sentencing remotely without violating the ban on broadcasting? I don't think so, Your Honor. I think Rule 32, which implements the Crime Victims' Rights Act, specifically says that victims must be present inside the courtroom in order to be heard. And here, in any event, there was a public link. Correct. So that's not what happened here. It was not just incoming testimony. It was also available. We have no idea who was listening, but it was available to be listened to, right? That's correct, Your Honor. I think here we have the district court itself in the Chamber's e-mail referring to this as a broadcast. The government, in its e-mail exchange with Chambers, referenced that the video link was being spread throughout the victim's community. Well, but in any event, isn't there an audio link posted on the public docket? Correct, Your Honor. So whatever happened with the video link, any member of – I could have called in and listened, right? Absolutely, Your Honor. And there's nothing in the record that suggests that. I didn't. That that did not happen, other than that Your Honor did not call in. Yes. Now that's in the record. And, of course, the purpose, the express purpose of that broadcast order, which was docketed, was to facilitate the public access and the media's access to the proceeding. Just briefly touching on the substantive reasonableness, Your Honor, the sentence imposed at 240 months is nearly double the high end of the guidelines. It's more than double the sentence recommended by probation. This despite the fact that Mr. Chakuri is nearly 50 years old, has serious health conditions, pled guilty, and yet he was sentenced to a statutory maximum sentence. The district court failed to explain adequately that sentence because it relied on factors already accounted for in the guidelines. And as this court said as recently as last month in United States v. Ramos, which is the subject of a 28-J letter we filed, where a district court relies on factors accounted for in the guidelines to justify an upward variant, it must explain why those factors do not adequately account for the sentence. Further, the sentence here creates enormous disparities with all relevant comparators. And I would draw the court's attention in particular to the case of Cesar Millan, who was sentenced in the Southern District around the same time for a very similar crime in which she played a very similar role. And the government, in fact, called the district court's attention to Ms. Millan and said that she was most akin to Mr. Chakuri. Ms. Millan received a sentence with the same guidelines, I'll add, she had the same sentence and guidelines range. She received a sentence of just 60 months, one quarter what Mr. Chakuri received. Didn't the district court, though, spend a fair amount of time talking about some factors that are not really reflected in the guidelines? Because it's beyond the number of victims that were involved, but it was the pressure that was put on those victims that perhaps intent to focus on folks who may be able to get friends and family involved and the ripple effects of what that is. So that's beyond what is really contemplated by the guidelines. I would submit, Your Honor, that the guidelines do account for the substantial hardship, the financial loss, and also the number of victims in the case. I think, you know, the district. But this is beyond just the number. This is essentially all that happened after that. The pressure not only on the individual person, but then to pressure those other people in your community. That does seem, it seems to me that the district court spent some time talking about those additional factors beyond what would be contemplated in the guidelines. I would submit, Your Honor, that the record showed that Mr. Chakuri engaged in conduct very similar to his co-defendants, Mr. Hernandez and Mr. Nunez. And the district court actually used remarkably similar language in imposing the sentence across the three co-defendants. They received sentences at the bottom or near the bottom of their guidelines' ranges. You know, this despite the fact that they were also senior promoters. This despite the fact that they engaged in much the same conduct. Thank you very much. Thank you. Judge Loewe, Judge Merriam, Judge Lanthier, may it please the Court. Juan Takori was an extraordinary fraudster who is the key promoter for and helped to run a crypto-ponzi scheme that targeted working class Latinos. Judge Torres recognized that Takori was not your average criminal or even the average criminal described by the guidelines. She saw this in the record. She saw this in the written victim impact statements, which by the way, contrary to what you just heard, included discussions of Juan Takori pressuring victims to sell their homes or to turn the proceeds of their homes over to him for investment. How did this happen? How did which happen? How did the broadcasting happen? Why did it happen? There have been very large cases where I think victims are not allowed to use the broadcast system, whatever the link is, but they are required to come into court. So what's special or unique about this case? I don't think that there was anything special and unique. And one of the things, and we point this out in our brief, is not only are there no published cases on this specific issue, but as we pointed out, there are cases where it happens in both ways, and there hasn't been significant litigation to this. And I think that there may be a number of reasons that there isn't significant litigation. This isn't the sort of thing that is typically litigated out. This is the sort of thing I think that defendants and the government simply go with whatever the judge below says. That is, this isn't really an appellate issue. This is a rule that contains no remedy within the rule. And this is also something where — That's right. That's the next question. Is it a form that's in a rule? Is that a structural error when the rule is violated? What is it? It is not. And I would note that McCrory has not claimed that it's a structural error, nor could he. The Supreme Court and this Court have said time and time again that structural errors are very rare and they are limited to specific fundamental constitutional protections. This doesn't implicate specific fundamental constitutional protections. Structural errors, for example, have been found in cases where there's a question of whether the courtroom is closed to the public. What's the purpose of this rule? The purpose of this rule is to help to direct judges as to what is and is not permitted within their courtroom. I know that, but what's the — why? I think that — You know, I will just say, during the pandemic, I had to deal with this and crafting a rule on behalf of the federal judiciary that would allow us, during the pandemic, to broadcast, for obvious reasons, criminal proceedings. But it's never been entirely clear to me why we had the rule in the first place. I think that the answer is that this has been a policy debate that's been going on for a long time. And in different jurisdictions, they've dealt with it different ways. As we know, by contrast, a number of state jurisdictions have regular filming and broadcasting, even on TV, of their court proceedings. For quite some time at the Supreme Court, you couldn't hear argument. Then they released archival tapes, and now they actually stream it as it goes along. This Court has audio feeds streaming. The Ninth Circuit has video feeds streaming. That is — this is something that I think different courts are experimenting with different policies. And so the Supreme Court, when it propagated the rules, added a rule making a policy judgment that, absent exceptions made by statute or by rule, the default would be no broadcasting of proceedings. Notably, they didn't define what broadcasting means. That was why we discussed United States v. Seal Defendant 1, which said, just so you know, broadcasting means something more public than going to individuals. In Seal Defendant 1, the defendant, as well as, by the way, the defendant's wife and others, were permitted to join by, I don't know if it was Teams or Zoom, but one of those versions. And the key there isn't that this is Seal Defendant 1, but that this Court has said not all electronic transmissions necessarily automatically, per se, become broadcast for something more intense. But because — the quote is, the sealed sentencing fell outside the scope of Rule 53. That's right.  That's what's sealed. So — but just before that is LaRue, right, which says, look, in criminal proceedings — because the rule's a little different in civil. And I think when Judge Loyer is asking the why, I think there's case law and discussion that talks about the why, right? Because people perform differently with an audience than not, right? And that's one of the concerns, and that might explain the reason this is stricter in criminal cases. Exactly. And that's why I just said I think this has been an ongoing debate. I don't think that there's any scientific consensus as to exactly how performance would happen. And certainly every time that there has been an increase in one or another broadcast, some people have said, will this affect things? And so far, it turns out they haven't. I don't want to claim to be on the Rules Committee for the Supreme Court and be able to resolve this. Your friend on the other side mentioned the solemnity of the proceedings in court, which is one factor. But I just don't understand how this happened exactly. Well, I think that what happened here — and if you look at the e-mails, you'll see there were questions from the court about victims, victims testifying. And because this is a case where the fraud was nationwide and, frankly, international in some scope, there were questions by victims. Hey, can we join remotely? And so there was simply a question by one of the AUSAs. Can we get a Teams link to be able to do this? And nobody objected. Is this kind of a COVID hangover? I mean, that's the first thing I thought was I got used to doing things remotely, you know, on the trial court during COVID. And sometimes you forget that the CARES Act is gone and we don't have that anymore. I mean, I get that it just happened. But the idea that it had no effect is surprising. The government argues, well, don't worry, it didn't have any effect, given that the government changed its recommendation after hearing from the victims, right? Well, first of all, we changed our recommendation. And I know this because I was the one who changed our recommendation. We changed our recommendation. We decided to change it before the video conferences. As I can tell you, internally, as Judge Lohier is aware, having been at our office, we're required to get approvals to change our recommendation. And I started that process before the videos started. So I know as a fact that— Before the sentencing hearing or before the videos started? Before the videos. So the first half of the victim statements were all in court. And I'm just saying that to the extent that the concern is, well, is there a realistic thing that isn't captured in the record, that somehow the video statements were what changed the government's mind, I can tell you. And the only reason I'm saying this, normally I don't reach outside of the record, but the implication is, is there something outside of the record to say this? And there's not. I was there and I was the one who did it. And this was on the basis of hearing over and over from these victims. And frankly, what it also didn't reflect is beforehand talking to the victims in the hallway, in the well, seeing the victims, and seeing Tocori and how he acted toward the victims, which you saw that Judge Torres was particularly perturbed by when she referred not once but twice to the fact that Tocori was smirking or smiling as he saw what had happened. And this was something that came up and that was obvious to anybody in the courtroom what was happening. He was utterly unrepentant about what was going on. If anything, he was proud about how well he had done here in the face of a courtroom that was packed to the gills, was literally standing room only in the court with his victims, only some of whom got to speak. And this was something that Judge Torres saw and was properly able to consider in crafting her sentence. In fact, if anything, this is the very purpose of the Crime Victims' Rights Act, is not only to allow the victims to have their day in court, but to allow the court to see what the impact on the victims was. And this was a circumstance in which Judge Torres was able to see it as plain as day in front of her. I know that I'm over. Unless the Court has any questions, I'm more than happy to rest on my briefs. Thank you very much. Thank you. So this is on plain error with respect to the broadcasting, is that correct? No, Your Honor. We submit that there was no opportunity to object when the application for the broadcast was made or saw. And that I don't understand because there was a leak that passed between those Yes, Your Honor. The government emailed its request to the district court chambers. The district court responded, granting the application just 17 minutes later. And then at some point that day, docketed the broadcast order as well. And there is no obligation under Rule 51 to seek reconsideration in order to preserve an issue for appeal. And that's reflected. Was there ever an objection? I'm sorry. I'm sorry, Your Honor. In answer to Judge Landier. Was there ever an objection? No, Your Honor. There was no. But we would submit that there is no obligation to seek reconsideration. There was no opportunity to object in that 17 minutes. But, and I understand your point about reconsideration. But we often say, look, you don't have to keep objecting to the same thing when the judge has made his or her position clear. But here, again, as Judge Landier says, and you weren't counsel below, I understand, but couldn't counsel have said, hey, I was in court on another matter when these emails went back and forth. I don't think we should be broadcasting this. Let's look at Rule 53. I'm not sure why the lawyer doesn't have that obligation. What the First Circuit said in Rodriguez and the Eighth Circuit in Burrell is that there is no obligation to try to relitigate something. But it was never litigated. Well, the government had asked for it and the district court granted it. I would suggest, Your Honors, though, that under any standard, Mr. Curry is entitled to relief. And that's why that goes to my question to Mr. Maynard. So I think, certainly, so I think the error was clear and obvious. And there are published opinions on that. Not only LaRue, but Sealed Defendant 1. And I would commend footnote 4 of that opinion to this Court's attention. With respect to prejudice and with respect to the effect on the fairness and public reputation of the proceeding, I think both the Supreme Court's decision in Rosales Mureles and this Court's decision in Wernick say that the mere possibility that a defendant is subject to a higher sentence satisfies both of those standards, meaning it significantly prejudices the defendant's rights and that it affects the fairness and public reputation and integrity of the proceeding. This is not a, and you would agree that this is not a structural error? Correct, Your Honor. We're not suggesting that it is. But where there are In any form, it's a rule violation, not a constitutional violation, for example. Not the sort of violation in the context of competition and the ability to be in court to confront. It doesn't quite rise to the constitutional level, Your Honor. But we would submit that it's a sentencing imposed in violation of law. In Martinez and in Axelrod, this Court has reversed because of those procedural errors. In Axelrod, for example, it was a Rule 32 violation. In addition, where there are procedural errors that affect sentencing, the Court has accorded less deference to the substantive sentence imposed. And in United States v. Hernandez and United States v. Regas, among other cases. I also Besides the solemnity, I'm sorry to delay this, but I'm trying to think through this. Besides the solemnity of the in-person proceeding, the fact that you've got to be in a federal courtroom, what is the purpose of this Rule? Judge Newman has spoken about it, and we said it in our brief, that it exposes those who speak within the courtroom to publicity, and that also has an effect. Is this not true of the link, of the Microsoft Teams link? In other words, in one sense, you've got a link that the press can access, and then you are speaking in a public way that's recorded. Why isn't that also true, then, of this broadcast? Well, of this broadcast, Your Honor? Well, Your Honor, I signed up for that, and witnesses generally did not, and it would be unfair to subject them to it. I think, actually, this case is a great example of why Rule 53 exists. The underlying scheme here, the four-count scheme, was a multilevel marketing scheme. So victims were incentivized to recruit other victims and victimize them unwittingly. And many victims who spoke, both in the courtroom and over the broadcast, mentioned that. They had recruited their family, their friends, their communities. And so because the sentencing was being broadcast, because it was being broadcast to their communities, they likely had an incentive to keep blame on Mr. DeCurry and try to minimize their own conduct. Of course, it's very difficult to know if any did that. And that's what the Supreme Court said in Estes v. Texas, what the Supreme Court acknowledged, which is it's very hard to pinpoint, in a particular case, all the sources of prejudice that might come from a broadcast. And that's why it's important that Rule 53 was promulgated. So if a thousand people had been in the courtroom and in an overflow room in the courthouse, wouldn't that have had the same effect? I don't think it would, Your Honor. I mean, I think the broadcast can go far wider than that. And moreover, that was not the case, of course, that there were not 2,000 folks, and there's nothing in the record. Not only that, but hypothetically. Okay, all right. Well, we got your argument well in line. And we'll reserve decisions to this matter.